## Lehman v. Central Dauphin School District

C.P. of Dauphin County, no. 1434 S 1998.

*Robert F. Claraval,* for plaintiffs.
*David R. Fine* and *Andrew H. Cline,* for defendant.

CHERRY, *J.,* December 11, 2000—Presently before this court is defendant's motion for post-trial relief, requesting a judgment n.o.v. Additionally, the plaintiffs have filed a motion to mold the verdict. The facts and procedural history of the case are as follows:

The plaintiff, Daniel Lehman, served for a number of years as the coordinator of transportation for Central Dauphin School District. On December 24, 1990, Mr. Lehman was injured in a motorcycle accident that was unrelated to his employment. Mr. Lehman continued experiencing medical problems resulting from the injuries sustained in the accident. In January of 1996, Mr. Lehman provided Central Dauphin with documentation from his doctors that he was unable to continue his employment with the school. He had also requested information regarding a sabbatical for restoration of health. On May 16, 1996, Mr. Lehman submitted an application for a sabbatical leave of absence for restoration of health and indicated that he would use his accumulated sick and vacation days to meet the return-to-work requirement. In August of 1996, Mr. Lehman received a letter from Michael Levin advising him that the board of school directors would not approve his request for sabbatical leave.

Plaintiffs commenced this action by filing a complaint on April 7, 1998, alleging claims both in contract and statutorily imposed conditions to Mr. Lehman's employment contract under the Public School Code of 1949. The defendant filed an answer with new matter on April 22, 1998.

On May 15, 1998, defendant filed a motion for summary judgment raising the issues that the plaintiffs' claim

was barred as a matter of law based upon the following: (1) the defendant's entitlement to governmental immunity under 42 Pa.C.S. §8541, and (2) that the statute of limitations had run because this action was not filed within 30 days of the issuance of an administrative decision. A three-judge panel of this court heard argument on defendant's motion. On September 3, 1998, Judge Hoover denied defendant's motion via an order without opinion. On September 17, 1998, the defendant filed a motion for reconsideration of Judge Hoover's order, or that, in the alternative, the order be amended to certify it for interlocutory appeal. Both requests were denied by an order dated October 15, 1998. On October 22, 1998, defendant filed a petition for review in the Commonwealth Court regarding the October 15, 1998 order. On November 2, 1998, the Commonwealth Court, per curiam, denied the petition for review.

On December 18, 1998, defendant filed a motion for summary judgment raising the following issues: (1) the plaintiff was not eligible for a sabbatical leave of absence under 24 P.S. §11-1168, and (2) that the statute of limitations had run because this action was not filed within 30 days of the issuance of an administrative decision. Argument for the motion was held before a three-judge panel, however, Judge Turgeon recused herself from the case. On April 30, 1999, Judge Kleinfelter issued an order and opinion denying defendant's motion for summary judgment.

On December 3, 1999, defendant filed a motion in limine to strike plaintiffs' jury demand. On January 18, 2000, Judge Kleinfelter issued a memorandum opinion and order denying defendant's motion.

Following a pretrial conference, this court issued a memorandum opinion and order indicating that an employee seeking a sabbatical leave for restoration of health may meet the return-to-work requirements under 24 P.S. §11-1168 by using accumulated sick leave.

The case was tried before a jury before this court from March 27 through March 29, 2000. The jury returned a verdict in favor of the plaintiffs. Specifically, the jury found that a contract existed between Mr. Lehman and Central Dauphin School District; that had he been granted a sabbatical leave of absence for restoration of health, Mr. Lehman would have had 240 sick and vacation days available to him at the conclusion of the sabbatical; and Mr. Lehman's retirement date would have been August 30, 1998. The jury awarded damages to the plaintiffs in the total amount of $120,900. The damage award included $31,500 for half salary for one year which Mr. Lehman would have received during the sabbatical and $89,400 in damages for the difference in retirement benefits Mr. Lehman receives from PSERS and the amount he would have received from PSERS had he been granted the sabbatical.

On April 5, 2000, plaintiffs filed a motion to mold the verdict, seeking $6,221.26 interest on the award for the half-salary for one year, and $1,895.02 interest on the retirement benefits. On April 10, 2000, defendant filed a motion for post-trial relief, requesting a judgment n.o.v. The defendant argued that the action should have been dismissed as a matter of law for the following reasons: (1) the plaintiff waived his right to judicial relief by his failure to pursue administrative remedies, (2) the defendant is entitled to governmental immunity, (3) the Pub-

lic School Code requires an employee to actually return to fulfilling his job functions at the conclusion of a requested sabbatical, and (4) the employer's policies did not create contract rights. The defendant also asserts that the jury's verdict is contrary to the evidence because (1) there was no evidence regarding formation of an oral contract, and (2) there was no evidence that Mr. Lehman had a sufficient number of sick and vacation days available to him.

Both parties filed briefs regarding the defendant's motion for post-trial relief and plaintiffs' motion to mold the verdict. This court heard argument on these issues on August 15, 2000.

## LEGAL DISCUSSION

There are two bases upon which a judgment n.o.v. can be entered: "one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second, the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure." *Davis v. Berwind Corp.*, 547 Pa. 260, 266, 690 A.2d 186, 189 (1997) (citing *Moure v. Raeuchle,* 529 Pa. 394, 402-403, 604 A.2d 1003, 1007 (1992)). A judgment n.o.v. is proper "only in a clear case where, viewing the evidence in the light most favorable to the verdict winner, and granting the verdict winner every reasonable favorable

inference, there is insufficient evidence to sustain the verdict." *Sundlun v. Shoemaker,* 421 Pa. Super. 353, 358, 617 A.2d 1330, 1333 (1992). A jury verdict will not be set aside absent a clear error of law or palpable abuse of discretion. *Id.* at 358, 617 A.2d at 1334. Furthermore, jury findings are presumed to be consistent unless there is no reasonable theory to support the jury's verdict. *James v. Nolan,* 418 Pa. Super. 425, 433, 614 A.2d 709, 713 (1992).

## FAILURE TO TAKE ADMINISTRATIVE APPEAL

The defendant asserts that the plaintiffs' claim did not present a permissible contract claim against a governmental unit. Rather, defendant argues that plaintiffs' claim is one of statutory entitlement for which a remedy was available in the form of an administrative appeal. Defendant claims that Mr. Lehman declined to pursue the administrative remedies, thereby waiving his right to judicial relief. This court does not agree.

In *School District of the City of Erie v. Erie Education Association,* 67 Pa. Commw. 383, 447 A.2d 686 (1982), the Commonwealth Court reinstated an arbitrator's decision that a revision of the sabbatical leave policy of the school district had violated its collective bargaining agreement with the association. In their analysis, the Commonwealth Court made the following statement:

"The power to make regulations pertaining to leave policy is not tantamount to a statutory declaration that the area is removed from bargaining; the parties to a contract may agree to restrict or allow negotiation over matters which the statute designates as within school board

power. Indeed, any collective bargaining by a public agency must necessarily involve matters committed by law to the agency's powers; only when the statute mandates exclusivity in exercise of the function would it be withdrawn by law from collective bargaining." *Id.* at 391, 447 A.2d at 689.

Mr. Lehman was a manager or administrator for Central Dauphin. (N.T. 66.) The managers' contracts consisted of two parts. The first part consisted of the salary which was established by the school board. (N.T. 66.) The second part described the benefits and referred the managers to the language for similar benefits listed in the teachers' contract. (N.T. 66, 127.) The benefits which were part of the managers' contract, including the terms and conditions of sabbatical leaves and the compensation, were outlined in the board policy manual. (N.T. 69, 71.) The managers received information regarding the various parts of the contract, including their fringe benefits, during negotiations with supervisors. (N.T. 73-74, 110, 127.) A benefit sheet was also attached to a letter which was received by the employee each July. (N.T. 127.) The managers were also informed that the Public School Laws were applicable to them. (N.T. 73-74, 128, 180-81.)

This court finds that this is a breach of contract claim. The Public School Code imposes certain conditions that must attend contracts with school employees. Therefore, the statute itself does not create a cause of action, but creates a statutorily imposed condition to Mr. Lehman's contract of employment. Accordingly, the plaintiffs were entitled to proceed with a breach of contract claim and

the verdict form indicates that the jury found that a contract existed between Mr. Lehman and Central Dauphin.

Additionally, this court finds that there was sufficient evidence presented at trial to indicate that there was no final order or adjudication from which Mr. Lehman could appeal. An "adjudication" is defined as "[a]ny final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made." 2 Pa.C.S. §101.

There was testimony from Mr. Gary Crissman, acting superintendent during the 1995-1996 school year, and Dr. Carolyn Dumaresq, former superintendent, regarding the custom and practice of Central Dauphin in reviewing a sabbatical application. The applicant must complete an application consisting of two forms. (N.T. 93-94.) The application would be reviewed by the personnel office to ensure that it was in compliance with the school board policy and section 1166 of the school code. (N.T. 94.) The application was then submitted to the board of school directors. (N.T. 94.) The board was not permitted to vote on personnel matters, such as sabbatical leave requests, in an executive session. Rather, a request for a sabbatical leave had to be voted on by the board at a public meeting. (N.T. 78-79; 100-101.) After the board took action on the application, the form would be signed, dated and placed in the employee's personnel file. If there was a problem in the processing, the individual would be notified of the specific requirements which had not been met. (N.T. 93-94.)

On May 16, 1996, Mr. Lehman submitted an application for a sabbatical leave for a restoration of health sabbatical. (N.T. 72, 116-17, 144.) Mr. Lehman was applying for a sabbatical leave for the first semester of 1996 and the second semester of 1997. (N.T. 136.) In August of 1996, Mr. Lehman received a letter from Mr. Levin, the district's solicitor, stating that the school board would not approve his request for sabbatical leave. (N.T. 120, 137.) However, there was testimony that Mr. Lehman's application had never been voted on by the school board at a public meeting. (N.T. 79, 96, 102, 121, 139.) The bottom of the sabbatical leave request designated for the recording of the board's action is blank. (N.T. 79, 96.)

Therefore, this court finds that there was sufficient evidence that no final adjudication had been made by the school board. As a result, Mr. Lehman could not pursue an administrative appeal and did not waive his right to judicial relief. Accordingly, defendant's request for post-trial relief on this matter is denied.

## GOVERNMENTAL IMMUNITY

The defendant argues that this action should have been dismissed on the basis that the school district is entitled to governmental immunity under 42 Pa.C.S. §8541. This issue has already been extensively reviewed by this court and denied review by the Commonwealth Court of Pennsylvania.

The school district is a political subdivision of the Commonwealth of Pennsylvania and a local agency of the Commonwealth. The defendant asserts that it is entitled to governmental immunity under 42 Pa.C.S. §8541 et seq. This statute is known as the Political Subdivision

Tort Claims Act and nowhere in the statute is there any reference to any contract claims. See 42 Pa.C.S. §8541 et seq. The Pennsylvania Supreme Court upheld the constitutionality of the Political Subdivision Tort Claims Act in the case of *Carroll v. County of York,* 496 Pa. 363, 437 A.2d 394 (1981). In their analysis, the Supreme Court stated: "the conferring of *tort* immunity upon political subdivisions is within the scope of the legislature's authority pursuant to article 1, section 11." *Id.* at 367, 437 A.2d at 396. (emphasis added) Under the Political Subdivision Tort Claims Act, "local government agencies are immune from liability for their *negligence* unless their actions fall within an enumerated exception and would otherwise subject them to liability." *Tiedeman v. City of Philadelphia,* 732 A.2d 696 (Pa. Commw. 1999), *appeal denied,* 562 Pa. 679, 753 A.2d 823 (2000). (emphasis added) The legislative intent underlying the legislature's enactment of subchapter C of chapter 85 of the Judicial Code, 42 Pa.C.S. §§8541-8565, was to insulate political subdivisions from *tort* liability. *Mascaro v. Youth Study Center,* 514 Pa. 351, 361, 523 A.2d 1118, 1123 (1997); *E-Z Parks Inc. v. Philadelphia Parking Authority,* 110 Pa. Commw. 629, 636, 532 A.2d 1272, 1276 (1987). (emphasis added)

There are a number of cases that uphold the proposition that a valid contract claim would not be subject to the provisions which provide for governmental immunity under section 8541 of the Political Subdivisions Tort Claims Act. See *Silkowski by Silkowski v. Hacker,* 95 Pa. Commw. 226, 228, 504 A.2d 995, 997 (1986) (finding that the claim against the county sounded in tort, thereby falling within the immunity provisions of the Political

Subdivision Tort Claims Act; however, had the claim sounded in contract, the immunity provisions of the Act would have been avoided); *Gilius v. Board of Supervisors of Fairview Township,* 122 Pa. Commw. 371, 377, 552 A.2d 327, 330 (1988), *appeal denied,* 523 Pa. 633, 564 A.2d 1262 (1989) ("This court has previously rejected attempts to avoid the immunity provisions of subchapter C by alleging causes of action which sound in tort but are fashioned as assumpsit counts. . . . To allow recovery of damages from the appellees for breach of implied warranty after refusing recovery for negligence would completely defeat the legislative grant of immunity."). See also, *Gordon v. Redevelopment Authority of the County of Washington,* 13 D.&C.4th 300 (Washington Cty. 1992); *Bernstein v. Shapiro,* 50 D.&C.3d 649 (Lehigh Cty. 1988); *Hurst v. East Hanover Township,* 33 D.&C.3d 157 (Dauphin Cty. 1984).

As previously discussed, this court finds that this matter is a breach of contract claim. Therefore, the governmental immunity granted as part of the Political Subdivisions Tort Claims Act is not applicable to this case. Accordingly, defendant's motion for post-trial relief on this issue is denied.

## PUBLIC SCHOOL CODE—SABBATICAL LEAVE FOR RESTORATION OF HEALTH

On March 24, 2000, this court issued a memorandum opinion and order ruling that under 24 P.S. §11-1168 of the Public School Code, an employee seeking a sabbatical leave for restoration of health may meet the return-to-work requirement by using accumulated sick leave upon conclusion of the sabbatical. However, whether the

plaintiff had accumulated enough sick leave to cover the 1997-1998 school year to meet the statutory requirements remained a question of fact to be determined by the jury. (N.T. 5.) The special verdict form indicated that the jury found that had the defendant granted Mr. Lehman a sabbatical leave of absence for restoration of health, he would have had 240 sick and vacation days available to him at the conclusion of that sabbatical leave.

The defendant takes exception to the court's memorandum opinion and order of March 24, 2000. The defendant argues that the return-to-employment requirement in the statute required an actual return to the performance of job functions. Additionally, defendant argues that an employee who takes a sabbatical for "restoration of health" must have an expectation that his health will improve during his leave and he will return to work at the end of the leave. Defendant asserts that from the outset Mr. Lehman had no expectation that his health would improve and he knew that he would not be able to return to work.

The applicable statutes provide as follows:[1]

*"Section 11-1166. Persons entitled*

*"(a) Any person employed in the public school system of this Commonwealth who has completed 10 years of satisfactory service as a professional employe or member of the supervisory, instructional or administrative*

---

1. 24 P.S. §11-1166 and §11-1168 were amended on June 28, 1996. Section 7 of the Act provided that the amended Act shall not apply to sabbatical leaves approved by a board of school directors prior to July 1, 1996. Although Mr. Lehman submitted his application for sabbatical on May 16, 1996, the school board never approved his application. Therefore, the amended statute is applicable.

*staff, or as a commissioned officer, of any board of school directors, county board of school directors, or any other part of the public school system of the Commonwealth, shall be entitled to a leave of absence for professional development or a sabbatical leave for restoration of health or, at the discretion of the board of school directors, for other purposes.* At least five consecutive years of such service shall have been in the school district from which leave of absence for professional development or sabbatical leave for restoration of health is sought, unless the board of school directors shall in its discretion allow a shorter time: Provided, however, That in the case of professional employes of area vocational-technical schools or technical institutes prior service in the participating school districts shall be credited toward such service requirement. A leave of absence for professional development or sabbatical leave for restoration of health shall be for a half or full school term or for two half school terms during a period of two years, at the option of such person: *Provided, however, if a sabbatical leave is requested because of the illness of an employe, a leave shall be granted for a period equivalent to a half or full school term or equivalent to two half school terms during a period of two years: Provided further, That if a sabbatical leave for restoration of health or a leave of absence for professional development for one half school term or its equivalent has been granted and the employe is unable to return to school service because of illness or physical disability, the employe, upon written request prior to the expiration of the original leave, shall be entitled to a further leave for one half school term or its equivalent: Provided further, That if a leave for a full*

*school term or its equivalent has been granted and the employe is unable to return to school service because of illness or physical disability, the board of school directors may extend such sabbatical leave for such periods as it may determine but not to exceed one full school term or its equivalent.* Thereafter, one leave of absence for professional development or a sabbatical leave for restoration of health shall be allowed after each seven years of service.

"(b) A sabbatical leave for restoration of health or a leave of absence for professional development granted to a regular employe shall also operate as a leave of absence without pay from all other school activities." 24 P.S. §11-1166. (emphasis added)

*"Section 11-1168. Return to employment*

*"(a) No leave of absence shall be granted unless such person shall agree to return to his or her employment with the school district for a period of not less than one school term immediately following such leave of absence.*

"(b) No such leave of absence shall be considered a termination or breach of the contract of employment, and the person on leave of absence shall be returned to the same position in the same school or schools he or she occupied prior thereto.

"(c) If the employe fails to return to employment *unless prevented by illness or physical disability,* the employe shall forfeit all benefits to which said employe would have been entitled under the provisions of this act for the period of the leave.

"(d) If such employe resigns or fails to return to his employment, the amount contributed by the school dis-

trict under section 1170 of this Act to the Public School Employes' Retirement Fund shall be deducted from the refund payable to such employe under existing law and the amount so deducted shall be refunded to the school district by which it was paid." 24 P.S. §11-1168. (emphasis added)

In interpreting any statute, the legislative intent behind the enactment of the statute controls its ultimate meaning and application. *DeLellis v. Borough of Verona,* 541 Pa. 3, 10, 660 A.2d 25, 29 (1995); 1 Pa.C.S. §1921(a). When attempting to ascertain the intention of the General Assembly the court must consider the following: (1) the occasion and necessity for the statute, (2) the circumstances under which it was enacted, (3) the mischief to be remedied, (4) the object to be attained, (5) the former law, if any, including other statutes upon the same or similar subjects, (6) the consequences of a particular interpretation, (7) the contemporaneous legislative history, and (8) legislative and administrative interpretations of such statute. 1 Pa.C.S. §1921 (1972); *Meier v. Maleski,* 670 A.2d 755, 759 (Pa. Commw. 1996), *affirmed,* 549 Pa. 171, 700 A.2d 1262 (1997).

The court must first look to the express language of the statute, which is to be read according to the plain meaning and common usage of the words. 1 Pa.C.S. §1903(a); *San Van Inc. v. School District of Derry Township,* 160 Pa. Commw. 483, 488, 635 A.2d 254, 257 (1993), *appeal denied,* 537 Pa. 655, 644 A.2d 740 (1994); *Commonwealth v. Lopez,* 444 Pa. Super. 206, 210, 663 A.2d 746, 748 (1995). A statute must be read in its entirety to properly interpret its meaning. *Fairmount In-*

*surance Company v. Commonwealth, Department of Insurance,* 85 Pa. Commw. 131, 136, 481 A.2d 696, 698 (1984).

Section 1166 of the Public School Code states that any person employed in the public school system who has completed 10 years of satisfactory service as a member of the administrative staff *shall be* entitled to sabbatical leave for restoration of health. There are also provisions within the statute to extend a sabbatical leave for restoration of health if the employee is unable to return to school service because of illness or physical disability. An employee who has been granted such a sabbatical for one half school term *shall be entitled* to a further leave for one half school term. Additionally, the board of school directors *may extend* a sabbatical for an additional full school term for an employee who has been granted a sabbatical for a full school term and is unable to return to work due to illness or physical disability.

Section 1168 of the Public School Code outlines a return-to-employment requirement with regard to sabbaticals. The statute provides that no leave of absence shall be granted unless the individual agrees to return to his employment with the school district for a period of not less than one school term immediately following the leave of absence. 24 P.S. §11-1168(a). The statute states that an employee who fails to return to employment, "unless prevented by illness or physical disability," forfeits all benefits to which he would have been entitled during the period of leave. 24 P.S. §11-1168(c). The inclusion of this language in the statute provides an exception to the return-to-work policy if an employee is prevented from

returning to his employment because of illness or physical disability.[2]

Mr. Lehman was injured in a motorcycle accident on December 24, 1990. (N.T. 114.) Since that time, he has experienced continuing back problems and has had five back surgeries. (N.T. 114-15.) By the end of 1994, Mr. Lehman's doctors advised him that he should consider leaving his job at Central Dauphin because sitting at the computer all day was very stressful to his back. (N.T. 141-42.) In 1995, Dr. Hoffman told Mr. Lehman that he was 100 percent totally disabled from working at his job with Central Dauphin. (N.T. 143-44.) In January of 1996, Mr. Lehman sent a letter to Gary Wendt, head of personnel, seeking information regarding a sabbatical for restoration of health. (N.T. 112-13, 115-16.) Mr. Lehman provided the school with documentation from his doctors regarding his medical condition. (N.T. 112.) On May 16, 1996, Mr. Lehman submitted an application for a sabbatical leave of absence. (N.T. 144.) In that application, he indicated that he would use his sick leave to meet the return-to-work requirement because his doctors did

2. The language included in 24 P.S. §11-1168 prior to the amendments which went into effect on June 28, 1996, provides for the same exception to the return-to-employment requirement. The previous statutory provision provides: "Upon expiration of a sabbatical leave, by consent of the school board, the requirement that the person on leave of absence shall return to the service of the school district or to the same position in the same school or schools that he or she occupied prior thereto, may be waived. If the school board has not waived the obligation to return to school service upon expiration of the sabbatical leave and the employe fails to do so, *unless prevented by illness or physical disability,* the employe shall forfeit all benefits to which said employe would have been entitled under the provisions of this Act for the period of the sabbatical leave."

not think that his health would improve to allow him to return to his position at the school. (N.T. 116, 144, 162.)

Accordingly, in this case, had Mr. Lehman been granted a sabbatical leave for restoration of health and been unable to return to work due to his physical disability, he could have applied for an extension of his sabbatical for an additional full school term. Clearly, under the statute, if Mr. Lehman was unable to return to work at the conclusion of his sabbatical due to physical disability, he would fall under the exception to the return-to-work requirement and would have been entitled to all of his benefits during the period of his sabbatical.

However, Mr. Lehman did not choose to pursue that option. At the time he submitted his application for a one-year sabbatical leave for restoration of health, he requested to utilize his sick and vacation days upon expiration of the sabbatical to fulfill his one-year return-to-work requirement. (N.T. 118.) Defendant argues that the return-to-employment provision of the statute required an actual return to the performance of job functions. This court disagrees.

An employee is defined as "a person who works for another in exchange for financial compensation." Webster's II: New College Dictionary, 1999. Furthermore, employment is defined as follows: (1) The act of employing or *state of being employed;* (2) the work in which one is engaged; or (3) an activity to which one devotes time. *Id.* (emphasis added) Furthermore, the Commonwealth Court interpreted the legislative intent regarding the waiver of the return-to-work requirement.[3]

3. Prior to the amendment on June 28, 1996, 24 P.S. §11-1168 included a provision allowing the school board to waive the return-to-employment requirement.

The Commonwealth Court noted that "the effect of a sabbatical is to maintain the teacher's employment status in every respect, not just the payment of salary. It follows, we think, that the legislative intent which must always be the focus of our inquiry in the interpretation of statutes, 1 Pa.C.S. §1921(a), was to give teachers this benefit so long as they remained in an *employment status* and that this status only could be changed by school board action waiving the teacher's duty to return." *Walter v. North Hills School District,* 87 Pa. Commw. 302, 307, 487 A.2d 85, 88 (1985). (emphasis added)

This court finds that the return to employment provision of the statute does not require an actual return to the performance of job functions. Rather, the plain reading of the language within the statute and the legislative history indicates that the return-to-work provision refers to the individual remaining in employment status for a period of one school term immediately following the sabbatical leave.

Pamela Hostetter, the human resources director of Central Dauphin School District, testified that pay status includes any time that an employee is actually receiving a paycheck from the district. (N.T. 59.) Dr. Carolyn Dumaresq, superintendent of Central Dauphin in 1987, testified that when an employee was on sick time, vacation or during the lapse period between full sick days and half sick days, the employee was considered in pay status as long as they were still employed. (N.T. 63, 75.) Dr. Dumaresq testified that if Mr. Lehman would have been granted his sabbatical, he would be still on compensable status receiving reduced salary, during which time his sick leave and vacation keep accruing.

(N.T. 76.) Additionally, if Mr. Lehman used his sabbatical and was then using sick and vacation days, he would still be accruing benefits at the same rate as long as he was on compensable status and pulling a paycheck. (N.T. 76, 96.) While Mr. Lehman was on sick leave, he was still in compensable status, so each month he would get that month's pro-ration of sick and vacation leave added to his account. (N.T. 80.)

This court finds that under 24 P.S. §11-1168 of the Public School Code, an employee seeking a sabbatical leave for restoration of health may meet the return-to-employment requirement by using accumulated sick leave and vacation days upon conclusion of the sabbatical.

This finding is not contrary to the legislative intent of the statute. "[C]omments made by legislators during the process of enacting a particular statute can be considered during the examination of the contemporaneous legislative history." *Commonwealth v. Henderson,* 444 Pa. Super. 170, 179, 663 A.2d 728, 732 (1995). The issue of teacher sabbaticals was discussed on numerous occasions within the Pennsylvania legislature. The following remarks were offered by Mr. Flick, prime sponsor of the Act amending the Public School Code, just prior to its passage in 1996:

"Mr. Speaker, I rise in support of the motion to concur in Senate changes to HB 1031. This vote is an important opportunity for every member of this chamber to send to the governor *a bill that will curb the abuses of sabbatical leaves while continuing to ensure that teachers and other school employees are able to take time off for the purpose of restoring health or legitimate professional development.*

"You will remember that only three months ago in this chamber we had a spirited discussion about what ought to be done about the sabbatical leave issue. Virtually every member agreed that existing law needed to be changed. Our debate that day was not whether something needed to be done but, rather, what that was to be.

"As the prime sponsor of HB 1031, my original objective was to abolish the entitlement in law for sabbaticals and allow each school board to establish its own rules on the issue. I proposed that the General Assembly strike every reference to sabbaticals in the School Code and that, in effect, we start over again.

"Many of you agreed with me that such an approach made sense. A majority, however, felt that my original language went too far. *The version of this bill that passed the House that day abolished travel sabbaticals, prohibited school boards from granting so-called 'terminal sabbaticals' (those given to employees who do not return to their school positions afterwards), but retained the entitlement to sabbaticals for study and restoration of health.*

"That version of the bill made an attempt to target the most serious sabbatical concerns but, in my opinion, it fell short of the mark. The most serious flaw in the bill as it left this chamber was that, despite its purported ban on travel sabbaticals, it would have permitted teachers to continue to travel while on leave. That is because the bill so loosely defined 'study sabbatical' that school employees who could demonstrate that something, anything they did while on leave was 'reasonably related' to their professional duties would be eligible to take the time off at taxpayers' expense.

"All of this leads us, Mr. Speaker, to the changes made by the Senate. As the bill left that chamber, it includes only two major changes from the version that the House had passed. First, instead of the undefined 'study sabbatical,' the bill now contains provisions for a 'leave of absence for professional development' which must consist of undergraduate or graduate level course work or other studies that would be subject to approval of school boards. And, second, the Senate added a new type of leave, an occupational exchange program, that would permit teachers and other school personnel to work in the private sector to gain workplace experience.

"Let me emphasize that HB 1031 as it returns to us from the Senate contains every element that the House had approved in the first place. *Teachers still would be entitled to leaves for health or study,* travel sabbaticals would be prohibited, as would the so-called 'terminal sabbaticals' for nonreturning employees. All those provisions remain in place. *Not one teacher or school employee who currently is eligible for a sabbatical could be denied a leave for health or professional development purposes. Their interests are adequately protected.* The Senate merely defined and created some reasonable requirements for those who wish to take time off for professional development.

"Mr. Speaker, this bill reaches the middle ground. It strikes a balance between the interests of teachers and school employees and the concerns of school boards and taxpayers. It protects the entitlement in law to sabbaticals but gives locally elected school boards greater authority to regulate them and to control the cost of this mandate. We are addressing the major concerns about

sabbaticals in a way that is fair to all. This vote, today, is our opportunity to conclude this long debate and enact meaningful sabbatical leave reform.

"Mr. Speaker, I urge a 'yes' vote on the motion to concur." Legislative Journal—House of Representatives, no. 51, June 26, 1996, pp. 1820-21.

The court finds that utilizing accumulated sick leave and vacation days to meet the return-to-work requirement conforms with the legislature's intent to protect the interests of an employee who was taking leave time for the purpose of restoring his health. Accordingly, defendant's motion for judgment n.o.v. on this issue is denied.

## CONTRACT RIGHTS

Defendant argues that an employer's policies cannot create contract rights in the circumstances presented in this case. The plaintiffs argued to the jury that an oral contract was formed through a combination of several policy statements and the contract between the district and the teacher's union.

Defendant asserts that the plaintiffs did not meet their burden of proving that the contract they alleged was approved in accordance with the applicable provisions of the Public School Code. The Public School Code includes the following language:

"The affirmative vote of a majority of all the members of the board of school directors in every school district, duly recorded, showing how each member voted, shall be required in order to take action on the following subjects:

"Entering into contracts of any kind, including contracts for the purchase of fuel or any supplies, where the amount involved exceeds $100.

"Fixing salaries or compensation of officers, teachers, or other appointees of the board of school directors." 24 P.S. §5-508.

The Pennsylvania Supreme Court interpreted this statute in *Mullen v. DuBois Area School District,* 436 Pa. 211, 259 A.2d 877 (1969). The Supreme Court held that "the requirement of a formal recorded vote to be directory only, although with the caveat that the proof from which board approval can be inferred must be solid." *Id.* at 216, 259 A.2d at 881. The Supreme Court explained its holding by stating:

"Any result other than the one we reach today would arm every school board in the Commonwealth with a tool by which they could regularly avoid otherwise valid contracts. . . . The burden of complying with the statute rests with the school boards; should they fail to conduct their business as required, the consequences ought to lie at their door, not at the door of their victims. They must not be permitted to advantage themselves of their own failures to the detriment of their employees." *Id.* at 217, 259 A.2d at 880-81.

Section 508 requires that a contract be approved by an affirmative vote of a majority of the school board members at a public meeting. However, a party will not be precluded from enforcing a contract simply because the board's vote was not recorded. *Hazleton Area School District v. Krasnoff,* 672 A.2d 858, 862 (Pa. Commw. 1996), *appeal denied,* 546 Pa. 670, 685 A.2d 548 (1996); *Preston v. Saucon Valley School District,* 666 A.2d 1120,

1123 (Pa. Commw. 1995), *appeal denied,* 545 Pa. 673, 681 A.2d 1344 (1996). "If the party can produce 'solid proof' of the majority's approval of the contract, then it may maintain a claim for damages under that contract." *Hazleton,* 672 A.2d at 862. (citations omitted) See also, *Harborcreek School District v. Harborcreek Education Association,* 65 Pa. Commw. 47, 441 A.2d 807 (1982).

Defendant claims that plaintiffs offered no evidence regarding the oral contract they alleged and therefore the plaintiffs did not sustain their burden of proof. This court does not agree. Mr. Lehman testified that in 1967 he began driving a school bus with Central Dauphin, but he did not have a written contract. He received a paycheck for the work he did, but did not have any benefits as a part-time school bus driver. (N.T. 106.) In 1969, Mr. Lehman was a dispatcher for transportation and later promoted to transportation manager, then assistant coordinator of transportation, then acting coordinator of transportation, and finally coordinator of transportation. Mr. Lehman testified that he never had a written contract with Central Dauphin, rather, the promotions were all instituted by a verbal contract. (N.T. 107, 109, 127.) In 1979, Mr. Lehman resigned from Central Dauphin. (N.T. 107.)

Mr. Lehman returned to work for Central Dauphin in 1985 as coordinator of transportation, which meant that he was considered a manager or administrator. (N.T. 66, 109.) Mr. Lehman testified that he did not have a written contract with Central Dauphin for this position. (N.T. 109, 127.) To his knowledge, none of the administrators had written contracts with the school district. (N.T. 127.) Additionally, Gary Crissman, superintendent during the 1995-1996 school year, testified that he had worked for

Central Dauphin School District from 1964 through 1999 in various positions. During that time he did not have a written contract until his last four years at Central Dauphin. (N.T. 91, 99.) Mr. Crissman also testified that he did not know of any other employees having a written contract. (N.T. 91.)

Regarding his position as coordinator of transportation, Mr. Lehman testified that he received a letter indicating that he was approved by the school board following a vote in a public meeting. (N.T. 109.) The managers' contracts consisted of two parts. The first part consisted of the salary which was established by the school board association. The second part described the benefits and referred the managers to the language for similar benefits listed in the teachers' contract. (N.T. 65-66, 127.) The benefit portion of the managers' contract was listed in the board policy manual. (N.T. 69.) Mr. Lehman was initially informed of his benefits during his job interview with his supervisor. (N.T. 110.) Additionally, the administrators were informed of their benefits during conferences with the superintendent or assistant superintendent which were held following board meetings. (N.T. 73, 110, 127.) Dr. Carolyn Dumaresq, superintendent of Central Dauphin in 1987, testified that even though the conferences were not the same as the formal negotiations with the teachers, an agreement was reached with the managers. (N.T. 73.) During the negotiations, the administrators were informed about all of the different parts of the contract and were also informed that the Public School Laws were applicable to them. (N.T. 73-74.) Additionally, a benefit sheet was attached to a letter which was received by the administrators each July following a pay raise. (N.T. 127.)

The managers were also entitled to other benefits which were not specifically listed in the employee fringe benefits document. (N.T. 86.) The administrators received "me too benefits" which meant that certain benefits that teachers received in their contracts were also benefits that were extended to the administrators, even though the administrators were not parties to the teachers' contract. (N.T. 86.) One such benefit was sabbatical leave. (N.T. 71.) The board policy manual outlined the terms and conditions of when an individual could take sabbatical leave, the types of sabbatical leave, and the compensation. (N.T. 71, pl. exhibit 7.) One of the types of sabbatical leave available to teachers and administrators was for restoration of health. (N.T. 72.)

In January of 1996, Mr. Lehman resigned his position with Central Dauphin School District. At that time, he had worked a total of 23.9 years with the school district. (N.T. 113.)

The verdict slip indicates that the jury found that a contract existed between Mr. Lehman and the Central Dauphin School District. A jury verdict may not be set aside in the absence of clear error of law or palpable abuse of discretion so contrary to the evidence that it shocks one's sense of justice. *Sundlun v. Shoemaker,* 421 Pa. Super. 353, 361, 617 A.2d 1330, 1334 (1992); *Kiser v. Schulte,* 538 Pa. 219, 225, 648 A.2d 1, 4 (1994).

This court finds that the jury's verdict was not against the weight of the evidence and does not shock this court's sense of justice. It is quite clear that the board approved Mr. Lehman's appointment as coordinator of transportation. Furthermore, it is evident that Mr. Lehman performed his duties under an oral contract with the school

district. It would be unconscionable to deny the validity of Mr. Lehman's oral contract after the school district received the benefit of Mr. Lehman's service for almost 24 years. Therefore, the defendant's motion for judgment n.o.v. on this issue is denied.

## NUMBER SICK/VACATION DAYS

As previously discussed, this court ruled that an employee seeking a sabbatical leave for restoration of health may meet the return-to-work requirements by using sick and vacation days. A school year consists of 180 days. (N.T. 42.) However, Mr. Lehman normally worked for 240 days a year, therefore he would have needed 240 days available to him at the end of that sabbatical leave to meet the return-to-work requirement. (N.T. 42, 48, 80, 181.)

The jury found that had Mr. Lehman been granted a sabbatical leave of absence for restoration of health, he would have had 240 sick and vacation days available to him at the conclusion of that sabbatical leave. Additionally, the jury found that Mr. Lehman had enough days to reach August 30, 1998, as a retirement date. Defendant claims that the jury's factual finding that Mr. Lehman had a sufficient number of sick and vacation days was not supported by the evidence. This court disagrees.

The entry of judgment n.o.v. is a drastic remedy and a court cannot lightly ignore the findings of a duly-selected jury. Thus, in considering a motion for judgment n.o.v., "the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising there-

from, and any conflict in the evidence must be resolved in his favor." *Simmons v. Pacor Inc.,* 543 Pa. 664, 672, 674 A.2d 232, 236 (1996).

There was extensive testimony regarding the number of sick and vacation days which Mr. Lehman had accumulated. There was testimony from Dr. Carolyn Dumaresq, superintendent of Central Dauphin in 1987; Gary Crissman, superintendent from 1995-1996; Pamela Hostetter, the human resources director of Central Dauphin School District; and Mr. Lehman. The school year ran from July 1 to June 30 each year. (N.T. 177.) The fiscal year for purposes of accumulating sick and vacation days starts on July 1 of each year. (N.T. 177.)

According to the testimony there were two policies which governed the benefits which were applicable to Mr. Lehman prior to June 30, 1997, the administrators received 15 paid vacation days at the beginning of each year. (N.T. 69-70, 125.) An employee could accrue up to 35 unused vacation days to carry over to the following year. (N.T. 69-70.) Each year an administrator also received 15 days of sick leave at full pay and 15 days of sick leave at half pay. (N.T. 70, 125, 171). The contract also included a 10-day lapse period between the time that an employee exhausted all of their full sick days and the time that the employee could use his half sick days. (N.T. 74-75, 125.) Employees were paid for a salary during the lapse time. (N.T. 75, 125, 175.) Prior to July 1, 1997, administrators received 22 holidays. (N.T. 178.)

Ms. Hostetter testified that at the beginning of the 1997-1998 school year, the policies for accumulated sick and vacation days changed. (N.T. 177.) The new policy was effective July 1, 1997. (N.T. 177.) The administra-

tor's compensation benefits still included 15 whole sick days, but they were no longer granted half sick days. However, anything that was in the employee banks was honored. (N.T. 177). Lapse days between any type of full leave and half day sick leave disappeared. (N.T. 177-78.) Additionally, vacation increased to 20 days. (N.T. 178.) After July 1, 1997, administrators only received 12 days for holidays. (N.T. 178.)

An employee continues to earn benefits as long as he is on compensable pay status, which includes any time an employee is actually receiving a paycheck from the school district. (N.T. 59, 76.) Accordingly, any time an employee was off on vacation, sick time, a lapse period between full and half sick days, or on sabbatical, the employee was considered in compensable pay status and continued accruing benefits. (N.T. 75-76, 96.) Additionally, any days that the school was closed, including a paid holiday or a snow day, was not counted against any vacation or sick leave used by the employee. (N.T. 89, 97.)

Mr. Lehman was applying for sabbatical leave for the first semester of 1996 and the second semester of 1997. (N.T. 136, 186.) There was testimony from both Ms. Hostetter and Dr. Dumaresq that the leave record for the 1995-1996 school year indicated that Mr. Lehman had the following amounts in his leave banks to carry over at the beginning of the year: 73 full sick days, 143 half sick days, and 21 vacation days. (N.T. 54-56, 80, 182-83.) On July 1, 1995, Mr. Lehman would have received an additional 15 full sick days, 15 half sick days, and 15 vacation days. (N.T. 56-57, 182-83.) Accordingly, beginning the 1995-1996 school year the total amount of

time available to Mr. Lehman was 88 full sick days, 158 half sick days, and 36 vacation days. (N.T. 57, 182-83.) Ms. Hostetter testified that during the 1995-1996 school year, Mr. Lehman used 88 full sick days, 11 half sick days, 10 lapse days, and 35 vacation days. (N.T. 184-85.) Ms. Hostetter testified that Mr. Lehman did not have any vacation days to carry over because he could only accumulate up to 35 vacation days in any one year. (N.T. 186.) Therefore, Ms. Hostetter testified that Mr. Lehman had a total of 147 days available as of June 31, 1996. (N.T. 188.) Additionally, Mr. Lehman would have received his yearly allowance of 15 sick days, 15 half sick days, and 15 vacation days for the 1996-1997 school year. (N.T. 188.)

Therefore, Mr. Lehman would have a total of 202 days available to him on July 1, 1996. (N.T. 188-89.)

However, according to the accrual policies which were previously discussed, this court finds that the jury could have concluded that Mr. Lehman also had one vacation day remaining at the end of the 1995-1996 school year to carry over into the 1996-1997 school year. Therefore, the jury could have concluded that after receiving his yearly allowance of sick and vacation days, Mr. Lehman had 203 days available to him on July 1, 1996.

Ms. Hostetter testified that her calculations showed that Mr. Lehman did not have enough accumulated sick leave and vacation days to reach the required 240 days. (N.T. 187-94.) However, she based these calculations on her assertion that when an employee asks for sabbatical leave for the first semester of the school year, the sabbatical begins on the first day that the teachers are due back to school. Therefore, Mr. Lehman's sabbatical

would have begun on August 22, 1996, and ended on June 10, 1997, which was the last day the teachers were in school for that year. (N.T. 186.) According to Ms. Hostetter's testimony, Mr. Lehman would have used 36 days from July 1, 1996, until his sabbatical began on August 22, 1996. (N.T. 189.) Therefore, Mr. Lehman would have had 166 days available upon the beginning of his sabbatical. (N.T. 190.) Ms. Hostetter testified that at the end of the sabbatical, on June 10, 1997, Mr. Lehman would still have 166 days available to him. (N.T. 190-91.) Mr. Lehman would have had to use 14 days of leave to get him to the beginning of the next school year. Therefore, Mr. Lehman would have had 152 days left on June 30, 1997. (N.T. 191.) On July 1, 1997, Mr. Lehman would receive his yearly allowance of leave. In accordance with the new policies, he would receive 15 full sick days and 20 vacation days. (N.T. 192.) Therefore, Mr. Lehman would have a total number of 187 leave days available to him on July 1, 1997. (N.T. 192.) Ms. Hostetter testified that Mr. Lehman's leave would have run out in March of 1998. (N.T. 194.)

However, there were discrepancies between Ms. Hostetter's testimony and that of some of the other witnesses. There was testimony that a school year runs from July 1 through June 30 of the following year. (N.T. 177.) A year is normally 180 days; however, Mr. Lehman is a year-round employee and worked 240 days per year. (N.T. 42, 80, 136.) Mr. Lehman testified that the specific dates set out in the school calendar when the semester starts and ends are not applicable to him because he is a year-round employee and works during the months that school was not in session. (N.T. 136, 154.) Additionally, Dr.

Dumaresq also provided testimony utilizing a sabbatical term which ran from June 1, 1996 through June 1, 1997. (N.T. 80-81.)

This court finds that it was possible for the jury to disregard Ms. Hostetter's conclusion that Mr. Lehman did not have enough sick and vacation leave to meet the 240 day return-to-work requirement. It is possible that the jury disregarded Ms. Hostetter's testimony that the sabbatical ran from August 22, 1996, through June 10, 1997. The jury may have determined that because of Mr. Lehman's status as a year-round employee, the sabbatical would run a full school year from July 1, 1996 through June 30, 1997. Therefore, Mr. Lehman would not have used some of the leave days which Ms. Hostetter testified were used between July 1, 1996, through August 22, 1996, and from June 10, 1997, through June 30, 1997. If this were the case, Mr. Lehman would still have a total of 202 or 203 leave days as of June 30, 1997. On July 1, 1997, Mr. Lehman would receive 20 vacation days and 15 sick days, in accordance with the policy changes. This would give Mr. Lehman a total of 237 or 238 leave days beginning the 1997-1998 school year.

In explaining her calculations, Ms. Hostetter testified that an employee earns benefits while he is in pay status, but the employee is only granted benefits once a year, and actually has to reach July 1 to get the accrued sick and vacation days added to his sick pay. (N.T. 59, 174, 183.) However, Dr. Dumaresq testified that the sick and vacation time was prorated. Therefore, if Mr. Lehman had days off and used sick leave, he was still in compensable status, so each month he would get that month's proration of sick and vacation leave added to his account.

(N.T. 80.) Each month Mr. Lehman would get that month's proration of sick and vacation leave added to his account. Dr. Dumaresq testified that Mr. Lehman could have continued to use sick and vacation time into late August of 1998, and the prorated benefits would take him to mid-September until they eventually ran out. (N.T. 81-82.)

Additionally, Ms. Hostetter testified that when he retired on May 16, 1997, Mr. Lehman had cashed out 12 and a half vacation days for pay. (N.T. 195.) However, Mr. Lehman testified that he did not receive any payment for any vacation days. (N.T. 148-49.)

Additionally, Mr. Lehman testified that the school had charged him for days of sick leave when the school was actually closed for snow days, and he was charged for half sick days on some days when the school was closed for holidays. (N.T. 126-27.)

This court finds that based on the testimony it was logical for the jury to conclude that Mr. Lehman had enough sick days and vacation days to meet the 240 day return-to-work requirement. The jury may have concluded that Mr. Lehman had 238 days at the start of the 1997-1998 school year and earned additional days through the monthly proration of benefits. The jury may also have concluded that Mr. Lehman had 12 extra days which were not cashed out upon his retirement or that Mr. Lehman was charged leave days when the school was closed for snow days or holidays. Therefore, this court finds that it was reasonable for the jury to conclude that Mr. Lehman had 240 sick and vacation days available to him at the conclusion of that sabbatical leave. It was also reasonable for the jury to conclude that Mr.

Lehman had extra leave days to give him a retirement date of August 30, 1998. Therefore, the jury's verdict shall not be disturbed and the defendant's motion for judgment n.o.v. on this issue is denied.

## MOLDING THE VERDICT

The jury returned a verdict against the Central Dauphin School District in the total amount of $120,900, which included $31,500 for half salary for one year and $89,400 for the total difference in Mr. Lehman's retirement benefits. The plaintiffs filed a motion to mold the jury's verdict to include interest. Plaintiffs seek an award of pre-judgment interest at the rate of six percent per annum.

Pennsylvania allows recovery of interest on judgments. The statute provides: "Except as otherwise provided by another statute, a judgment for a specific sum of money shall bear interest at the lawful rate from the date of the verdict or award, or from the date of the judgment, if the judgment is not entered upon a verdict or award." 42 Pa.C.S. §8101 (1976). Although the statute does not specifically provide for an award of pre-verdict interest, Pennsylvania courts have awarded such interest in cases where justice so requires. *Sack v. Feinman,* 489 Pa. 152, 162, 413 A.2d 1059, 1064 (1980). The decision to award pre-verdict interest on damages is within the discretion of the court. The purpose of awarding pre-verdict interest is to make a party whole again and prevent unjust enrichment. *Id.* at 164, 413 A.2d at 1065-66.

The defendant does not challenge plaintiffs' calculation to include $6,221.26 interest on the jury's award of $31,500 for the half-salary for one year. Therefore, that

portion of the award will be molded to a total amount of $37,721.26.

However, the defendant argues that no interest is payable on the jury's award for the difference in Mr. Lehman's retirement benefits. This court agrees. The award of retirement benefits required the jury to calculate the difference in Mr. Lehman's monthly benefit and take into consideration the life expectancy for both Mr. and Mrs. Lehman. Accordingly, the damages awarded for the total difference in Mr. Lehman's retirement benefits were not liquidated and provided prospective relief. Accordingly, this court finds an award of pre-verdict interest on the total difference in retirement benefits is not warranted. Therefore, plaintiffs' motion to mold the verdict to reflect pre-verdict interest on the jury award for the total difference in retirement benefits is denied.

Accordingly, the following is entered:

## ORDER

And now, December 11, 2000, it is hereby ordered and decreed as follows:

(1) Defendant's motion for post-trial relief is denied on all counts.

(2) Plaintiffs' motion to mold the verdict is granted in part and denied in part. The portion of the verdict awarded for the half-salary for one year will be molded to include pre-judgment interest in the amount of $6,221.26. The portion of the verdict awarded for the total difference in retirement benefits will not be molded to include pre-judgment interest. The total verdict will be increased from $120,900 to $127,121.